1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

NIKKOLAS WREN KENNETH
LOOKABILL, FRANK WESCOM, JR.,
parent and as personal representative of
the Estate of NIKKOLAS LOOKABILL,
deceased, DENISE WESCOM, and
GAGE WESCOM,

CASE NO. 13-5461 RJB

ORDER ON DEFENDANTS'
GOMEZ, SCHULTZ AND
GUTIERREZ'S RENEWED MOTION
FOR SUMMARY JUDGMENT

9
10
11

Plaintiffs,

12

v.

13
14
15

CITY OF VANCOUVER, Vancouver
Police Officers FRANKLIN N. GOMEZ,
SERGEANT JOHN DARREN
SCHULTZ, GERARDO GUTIERREZ;
and DOES 1-5 inclusive,

16

Defendants.

17
18

This matter comes before the Court on Defendants Franklin Gomez, John Schultz and

19

Gerardo Gutierrez's Renewed Motion for Summary Judgment Re: Qualified Immunity (Dkt.

20

104) and their motion to strike (Dkt. 109).  The Court has reviewed the pleadings filed regarding

the motions and the remaining file.

21

This case arises from a tragic September 7, 2010 police officer involved shooting that

22

resulted in the death of military veteran Nikkolas Lookabill, who suffered from post traumatic

23
24

1  stress disorder.  Dkt. 101.  Plaintiffs bring constitutional claims pursuant to 42 U.S.C. § 1983 and

2  a claim under the Americans with Disabilities Act ("ADA").  *Id.*

3      The individual defendants move to have the claims against them summarily dismissed.

4  Dkt. 104.  Even viewing the facts in a light most favorable to Plaintiffs, the record indicates that

5  the individual officers did not violate the Plaintiffs' constitutional rights, and even if they had,

6  the officers are entitled to qualified immunity.  The individual officers' motion (Dkt. 104) should

7  be granted.

8  **I.      FACTS AND PROCEDURAL HISTORY**

9  A.  **BACKGROUND FACTS**

10      On September 7, 2010, Mitchell Tarbutton and Devin Sailer lived at 2901 Fruit Valley Road

11  in Vancouver, Washington.  Dkt. 59, at 1.  Mr. Sailer, Mr. Tarbutton, and two other friends,

12  Kyle Tingley and Brandon Presler, were at Mr. Tarbutton's home after leaving a bar.  *Id.*, at 2.

13  Mr. Tingley, Mr. Presler, and Mr. Tarbutton were outside on the porch smoking.  Dkt. 45, at 7.

14  Around 3:30 a.m. they heard yelling and barking dogs across the street.  *Id.*  Nikkolas Lookabill,

15  who was walking south along Fruit Valley Road, stopped to yell, and even bark, at the dogs.

16  Dkt 59, at 1.  According to Mr. Tarbutton, Mr. Lookabill was wearing gray sweat pants and a

17  sweatshirt.  *Id.*  Mr. Lookabill was talking on a cell phone.  Dkt. 45, at 8.  Mr. Tarbutton and the

18  others did not know Mr. Lookabill. Dkt. 59.

19      Mr. Tarbutton threw a beer bottle at Mr. Lookabill to scare him off.  *Id.*  Mr. Lookabill then

20  said, "Friend or foe?"  *Id.*  Mr. Tarbutton responded, "Friend, but leave.  We're going to call the

21  cops if you don't go."  *Id.*  Mr. Lookabill remained.  *Id.*  Mr. Tingley approached Mr. Lookabill

22  and repeatedly asked him to leave.  *Id.*  Mr. Lookabill informed the group he had a gun and

23  again asked "Friend or foe?"  *Id.*  Mr. Tingley shook Mr. Lookabill's hand, and then Mr.

24  Lookabill pulled out his gun.  *Id.*  Mr. Presler called 9-1-1 and told dispatch that Mr. Lookabill

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 2

1  was yelling at them, drunk, "not really coherent," and "threatening with a gun." Dkt. 39-1, at 7-

2  8. In response to the question of why Mr. Lookabill was upset, Mr. Presler told dispatch that

3  Mr. Lookabill was "[j]ust walking down the road. And he's drunk. I don't know. He's just

4  randomly causing problems. He started yelling at the dogs and then started yelling at us. We

5  were standing across the street." Dkt. 39-1, at 7. Mr. Tingley stated that after Mr. Lookabill

6  pulled the gun, he put the gun back into his right sweatshirt pocket. Dkt. 107-9, at 9. Mr.

7  Tingley then turned and crossed the street. Dkt. 107-9, at 9.

8      City of Vancouver Police Officer Gerardo Gutierrez, a defendant here, arrived about that

9  time, around 3:39 a.m. Dkts. 107-5, at 3, 107-10, at 3, and 107-12. Officer Gutierrez had his

10  lights off at first, but then turned on his spotlight and pointed it at Mr. Lookabill. Dkt. 107-5, at

11  4. Officer Gutierrez stated that Mr. Lookabill pointed at him with his left hand and, although he

12  could not see Mr. Lookabill's right hand, Mr. Lookabill was holding an object "at a low ready."

13  Dkt. 107-5, at 4. Officer Gutierrez testified that Mr. Lookabill then began to back away from

14  him and had the gun out. Dkt. 107-12, at 10 and 14. Officer Gutierrez testified that he told him

15  to "stop" and "drop the gun." Dkt. 107-12, at 14. Mr. Lookabill did not drop the gun, but put it

16  in his pocket. Dkt. 107-12, at 14. In a police interview, Mr. Presler stated that he did not see the

17  gun out at that point, but stated that Mr. Lookabill was giving Officer Gutierrez "a little bit a

18  problems [sic]." Dkt. 107-6, at 3-4. Officer Gutierrez told Mr. Lookabill to get on the ground,

19  which he finally did, and to face away from the officer, which he did not do. Dkt. 107-5, at 5.

20  As Mr. Lookabill got on the ground Officer Gutierrez heard a "metal clinking sound." Dkt. 107-

21  5, at 5. Mr. Lookabill yelled erratically about being in the military and being in Iraq. Dkt. 107-

22  5, at 6. Officer Gutierrez got out of his car, stood with the driver-side door open, and was using

23  the police car and door as cover. Dkt. 107-5, at 5. His lower legs and upper body were exposed.

24  His weapon was drawn. Dkt. 107-5, at 5.

1    Officer Gutierrez suspected that Mr. Lookabill was intoxicated.  Dkt. 107-5, at 8.  Mr.

2    Lookabill acted extremely angry, then switched to being somber, then angry again.  Dkt. 107-5,

3    at 8.  Officer Gutierrez felt that his manner and speech were aggressive.  Dkt. 107-5, at 8.

4    Officer Gutierrez stated that he ordered Mr. Lookabill to put his hands out to his side and then,

5    when he stopped doing that, Officer Gutierrez tried ordering him to put his hands on his head.

6    Dkt. 107-5, at 9.

7    Sergeant John Schultz, a defendant here, arrived on the scene a few minutes later, and as a

8    prior hostage negotiator, began to talk to Mr. Lookabill.  Dkt. 107-5, at 9.  Other officers also

9    arrived (Dkt. 107-6, at 4) including Officer Frank Gomez (Dkt. 107-4, at 2-9), who is also a

10   defendant here.  Officer Gomez, armed with a rifle, moved to the left of Officer Gutierrez, who

11   was still using the police car and car door for cover.  Dkt. 107-4, at 4.  Officer Gomez could see

12   the gun in Mr. Lookabill's right pocket.  Dkt. 107-15, at 14.  Mr. Lookabill was over 20 feet

13   away from Officers Gomez and Gutierrez.  Dkt. 107-15, at 17.

14   Sergeant Schultz stated that when he arrived, Mr. Lookabill was yelling.  Dkt. 105-2, at 8.

15   Sergeant Schultz testified they had the following exchange:

16           During the time that he was yelling and I was trying to talk to him he
     would say things like you mother-fuckers are going to have to shoot me. He said
17   things like you are going to send that dog in to bite my face. He repeatedly said
     fuck you.
18           He said that he was in Iraq. He told me that he should be on the other side
     of this with us. He told me or I told him -- as I'm attempting to talk to him I told
19   him things like you are not in trouble, nobody is here to hurt you. I repeated that.
             He told me he should have been on our side.  He said that he had wanted
20   to be a cop. When I told him that he was not in trouble, he told me not to use my
     cop shit -- he said don't use your cop shit on me, it is not going to work, I believe
21   is what he said.  He said he was in fucking Iraq. He said you mother-fuckers are
     going to have to shoot me.
22           I repeatedly tried to talk to him. I repeatedly tried to get his attention. I
     told him my name was John. I told him I was with the police. He told me he had a
23   gun. He told me it was in his front stomach pocket or front pocket.

24

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 4

1          He told me he was going to reach for his gun.  I told him not to reach for
his gun. I told him do not reach for your gun. I believe what I said was, Nikkolas,
2 do not reach for your gun.

3 Dkt. 105-2, at 8-9.

4          Around this time, Officer Gutierrez realized that he knew Mr. Lookabill from a prior

5 incident a few months before.  Dkts. 107-5, at 6 and 107-12, at 18.  Officer Gutierrez recalled

6 Mr. Lookabill's girlfriend had reported Mr. Lookabill was suffering from post traumatic stress

7 disorder and was talking about suicide.  Dkt. 107-5, at 6-7 and 107-12, at 17-18.  Officer

8 Gutierrez remembered that in that incident, Mr. Lookabill was taken to the Veteran's Hospital.

9 Dkt. 107-5, at 7.  He recalled that Mr. Lookabill expressed an interest in becoming a police

10 officer at that time as well.  Dkt. 107-5, at 7.  Officer Gutierrez did not have a chance to tell

11 Sergeant Schultz that he had had prior contact with Mr. Lookabill.  Dkt. 107-12, at 18.

12          At the officers' request, Mr. Tarbutton, Mr. Tingley and Mr. Presler moved toward Mr.

13 Tarbutton's home.  Dkt. 59, at 3.  Mr. Tarbutton went in the home, looked out his open front

14 door, and could see Mr. Lookabill lying down on his stomach.  Dkts. 59, at 3 and 105-4, at 23.

15 Mr. Tingley and Presler went to the side of the house and watched.  Dkt. 107-6, at 5.

16          Mr. Tarbutton stated that Mr. Lookabill appeared to "be angry and agitated," was "yelling to

17 the officers about his girlfriend or something," and slurring his words.  Dkt. 59, at 3-4.  In his

18 declaration, Mr. Tarbutton stated that Mr. Lookabill was "flat on his stomach and his arms, legs

19 and hands were spread out" the entire time.  Dkt. 59, at 40.  Mr. Tarbutton later testified that Mr.

20 Lookabill flipped the officers off four or five times, was moving his arms "out and around" and

21 was kicking his legs.  Dkt. 107-16, at 15 and 13.  Mr. Tarbutton also stated that his roommate,

22 Devin Sailor, came downstairs and asked what all the shouting was about.  Dkt. 59, at 4.  Mr.

23 Tarbutton turned and spoke with Mr. Sailer for a moment.  Dkts. 59, at 4 and 105-4, at 11 and

24 22.  Mr. Sailer then walked off and used the restroom.  Dkt. 105-4, at 20.  Mr. Tarbutton stated

that he never felt like Mr. Lookabill's motions were threatening.  Dkt. 107-16, at 14.  He described Mr. Lookabill's movement more like a "tantrum . . . like just upset, waving his arms around because he's upset, not because he's trying to reach for his gun or anything."  Dkt. 107-16, at 14.  Mr. Tingley remembered Mr. Lookabill rolling around and flipping over onto his back and flipping the officers off.  Dkt. 107-8, at 11.  Mr. Presler stated that Mr. Lookabill stayed on the ground "but other than that he was just kinda flailing."  Dkt. 107-6, at 6.

Officer Gomez stated that Mr. Lookabill kept lifting his upper body off the ground, turning his head, and looking around.  Dkt. 107-4, at 5.  Officer Gomez stated that Mr. Lookabill was screaming obscenities, was very agitated, and not compliant.  Dkt. 107-4, at 5.  Officer Gomez asserted that Mr. Lookabill kept raising his body off the ground looking around "as if he was looking to find where [the police officers] were" in order to target them.  Dkt. 107-15, at 24.  Sergeant Schultz described Mr. Lookabill as agitated and aggressive.  Dkt. 107-7, at 8.

Sergeant Schultz was concerned about Mr. Lookabill's continued mention of his military service in Iraq.  Dkt. 107-7, at 8.  He was worried about Mr. Lookabill's combat experience and what that would mean tactically for the officers present.  Dkt. 107-7, at 8.  Sergeant Schultz kept trying to talk with Mr. Lookabill to calm him down.  Dkt. 105-2, at 9.  He stated that Mr. Lookabill kept saying that the police officers were "going to have to shoot [him]."  Dkt. 105-2, at 9.

Mr. Tarbutton stated that Mr. Lookabill said, "come take the gun from me" multiple times.  Dkt. 107-16, at 12.  Mr. Tarbutton stated that Mr. Lookabill told the officers that the gun was in the center pocket of his sweatshirt.  Dkt. 59, at 3.  According to Mr. Tarbutton, the officers responded with "you need to calm down more."  Dkt. 107-16, at 12.  Mr. Tarbutton felt that the officers were just "waiting for something."  Dkt. 107-16, at 13.  Mr. Tarbutton heard the officers repeatedly tell Mr. Lookabill not to reach for his pocket.  Dkt. 107-16, at 13-14.

1   Mr. Tarbutton stated that Mr. Lookabill started talking about wanting to throw the gun into

2   the road and asked the officers if they were going to shoot him if he did.  Dkt. 59, at 3.  Mr.

3   Tarbutton stated that eventually, Mr. Lookabill wasn't "barking orders," but was kind of

4   "begging" the police to come take the gun from him.  Dkt. 107-16, at 16.  According to Mr.

5   Tarbutton, Mr. Lookabill was "literally begging like, 'Come take the gun from me.'  Like,

6   'Please come take the gun from me.'"  Dkt. 107-16, at 16.

7   According to Mr. Tarbutton, Mr. Lookabill said, "I'm going to countdown from thirty and

8   then if you don't come take the gun from me, I'm going to start smashing my head into the

9   sidewalk."  Dkt. 59, at 3-4.  Officer Gutierrez stated that he was under the impression that Mr.

10   Lookabill was going to do a countdown and then stand up.  Dkt. 107-5, at 11.  Mr. Presler stated

11   that he thought that Mr. Lookabill said that after he did the countdown "I'm gonna shoot myself

12   in the head if I get to zero if you guys don't take my gun." Dkt.107-6, at 5.

13   Mr. Lookabill counted down.  Dkt. 59, at 4.  Mr. Tingley stated that after the countdown,

14   Mr. Lookabill flipped over onto his back and flipped the officers off again while screaming

15   obscenities.  Dkt. 107-8, at 12.  Mr. Tarbutton stated that after Mr. Lookabill "moved his arms

16   up to flip the officers off" he then moved them over his head again.  Dkt. 59, at 4.  Officer

17   Gutierrez stated that Mr. Lookabill kept saying "Just kill me," and "I'm not going to shoot you"

18   and that he wanted to be a cop.  Dkt. 107-5, at 13.  Mr. Presler stated that after the countdown,

19   Mr. Lookabill said "What, you guys don't F'n care about me, you don't care if I do it or not?"

20   Dkt. 107-6, at 5.

21   About this point, Mr. Lookabill took off his wedding ring and threw it.  Dkt. 107-5, at 11.

22   Officer Gutierrez thought, "Oh, that's not good."  Dkt. 107-5, at 11.

23   Sergeant Schultz kept talking with Mr. Lookabill, but could not seem to calm him down, so

24   he contacted dispatch on his radio and requested that the leader from the hostage negotiator team

1   be sent to the scene.  Dkt. 105-2, at 19-23.  The other negotiator did not arrive until after shots

2   were fired.  *Id.*

3       Officer Gutierrez stated that Sergeant Schultz kept telling Mr. Lookabill, "'Do not bring

4   your hands down by your waistband,' because he was starting to do [that]."  Dkt. 107-5, at 11.

5   Officer Gutierrez stated that, at one point, Mr. Lookabill (who was on his stomach) said "Like

6   this?" and quickly raised up and moved his right hand up and down toward his waistband.  Dkt.

7   107-5, at 11.  Mr. Presler also saw Mr. Lookabill reach for his waistband at that point.  107-6, at

8   6.  The officers screamed "don't do that."  Dkt. 39-1, at 14.  Officer Gutierrez was shocked that

9   Mr. Lookabill moved so quickly and in a "taunting" manner.  Dkt. 107-5, at 12.  Officer

10  Gutierrez  turned to Officer Gomez and said that if Mr. Lookabill did something like that again,

11  he was going to shoot him.  Dkt. 107-5, at 12.

12      After that, Officer Gutierrez stated that Mr. Lookabill was face down with his hands

13  approximately at shoulder level. Dkts. 107-5, at 14 and 107-13, at 3.   According to Mr. Presler,

14  the officers kept telling Mr. Lookabill to stay still, stay on the ground, and keep his hands flat on

15  the ground.  Dkt. 107-6, at 6.  Mr. Lookabill made a motion with his left hand, and then

16  suddenly brought his right hand down toward his waistband.  Dkt. 107-5, at 14.  According to

17  Officer Donald Margarian, as he reached down, Mr. Lookabill's hand made a gripping type

18  motion toward the gun that Officer Margarian could see sticking out of his sweatshirt pocket.

19  Dkt. 49, at 27-28.  Officer Gutierrez and Officer Gomez fired one round at Mr. Lookabill's

20  upper torso.  Dkts. 107-5, at 14 and 107-4, at 7.  Mr. Lookabill continued to move his right hand

21  down and he brought his right knee up.  Dkts. 107-5, at 14 and 107-4, at 7.  As Mr. Lookabill

22  rose up, Officer Gutierrez fired at him again, and Mr. Lookabill began to roll toward Officer

23  Gutierrez.  Dkt. 107-5, at 15.  Officer Gutierrez stated that Mr. Lookabill had the gun in his hand

24  and was drawing it out of his sweatshirt at that point.  Dkt. 105-1, at 16.  Officer Gutierrez then

1   fired a third, fourth, and fifth time.  Dkt. 107-5, at 15.  Officer Gomez also fired two additional

2   shots, aiming for Mr. Lookabill's head.  Dkt. 107-4, at 7.  Sergeant Schultz fired his weapon

3   twice as well.  Dkts. 107-7, at 9 and 107-14, at 18.  The shots were fired around 4:02 a.m.  Dkt.

4   107-10, at 3.

5       Mr. Presler, who was still watching from the side of the house, saw Mr. Lookabill move his

6   right arm down "like he was gonna reach for a gun."  Dkt. 107-6, at 5.  Mr. Tingley saw Mr.

7   Lookabill roll around and then reached with his right hand down toward his waist.  Dkt. 107-8,

8   at 7.  Although in his declaration, Mr. Tarbutton stated that he did not see Mr. Lookabill reach

9   for his gun, in his deposition, Mr. Tarbutton acknowledged that his roommate, Mr. Sailer,

10  returned from the restroom and Mr. Tarbutton turned and spoke with Mr. Sailer.  Dkts. 59, at 4

11  and 105-4, at 11 and 22.  Mr. Tarbutton stated that "[a] minute or two later, I then heard

12  gunshots and looked out and saw Mr. Lookabill roll over to his back and his hands kind of came

13  up."  Dkt. 59, at 4.

14      Mr. Lookabill died at the scene from multiple gunshot wounds.  At the time of death, his

15  blood reflected an alcohol content of .23 g/100 ml and a .12 mg/liter of the antidepressant

16  citolopram. Dkt. 107-11, at 8.

17  **B.  PROCEDURAL HISTORY**

18      On April 14, 2013, Frank Wescom, Jr., filed a Claim for Damages with Clark County's Risk

19  Management under RCW 4.96.020.  Dkt. 20.

20      On May 29, 2013, Plaintiffs filed a complaint in federal court regarding this matter.  *Nikkolas*

21  *Wren Kenneth Lookabill, et al. v. City of Vancouver,* Western District of Washington case

22  number 13-5408 RJB, Dkt. 1.  It was voluntarily dismissed without prejudice (Dkt. 8) and a

23  minute order closing the case was entered (Dkt. 9).  *Nikkolas Wren Kenneth Lookabill, et al. v.*

24  *City of Vancouver,* Western District of Washington case number 13-5408 RJB.  Plaintiffs re-filed

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 9

the case on June 11, 2013.  *Nikkolas Wren Kenneth Lookabill, et al. v. City of Vancouver,*

Western District of Washington case number 13-5408.  On August 20, 2013, Plaintiffs filed an

Amended Complaint.  Dkt. 13.  On October 24, 2013, the Defendants' Motion for Summary

Judgment was denied, in part, and granted, in part.  Dkt. 33.  Plaintiffs' state law claims were

dismissed, and Plaintiffs' motion to amend their Amended Complaint was granted.  *Id.*

Defendants then moved for summary judgment, arguing that all federal claims against the

individual officers should be dismissed because they did not violate anyone's constitutional

rights.  Dkts. 38 and 74.  They argued that even if there was a constitutional violation under the

facts alleged, the law was not clearly established, and they were therefore entitled to qualified

immunity.  *Id.*  On January 2, 2014, Plaintiff's motion to defer consideration of Defendants'

summary judgment motion, pursuant to Fed. R. Civ. P. 56(d), (Dkt. 57) was granted.  Dkt. 76.

Defendants appealed the decision granting Plaintiff's motion to defer consideration of

Defendants' summary judgment motion pursuant to Fed. R. Civ. P. 56(d) (Dkt. 76) to the Ninth

Circuit Court of Appeals (Dkt. 79), where the appeal was dismissed for lack of jurisdiction (Dkt.

85).  Defendants' petition for writ of certiorari was denied by the United States Supreme Court

on December 15, 2014.  *Schultz v. Wescom*, 135 S. Ct. 869 (2014).

After the Ninth Circuit Court of Appeals issued its mandate (Dkt. 94), this Court entered a

new scheduling order (Dkt. 97).  Plaintiffs' motion to file a third amended complaint was granted

on January 30, 2015.  Dkt. 100.

The Third Amended Complaint, filed on February 4, 2015, asserts claims against the

individual officers pursuant to 42 U.S.C. § 1983 for violation of: 1) Mr. Lookabill's Fourth

Amendment right against an unreasonable seizure by "detaining [him] for more than half an hour

and keeping Lookabill face down in the rain;" 2) Mr. Lookabill's Fourth and Fourteenth

1  Amendment rights against the use of excessive force, 3) Mr. Lookabill's Fourth and Fourteenth

2  Amendment rights against "wrongful death," 4) Ms. Wescom's Fourteenth Amendment right to

3  family unity, and 5) Mr. Frank Wescom and Mr. Gage Wescom's First Amendment rights to

4  family unity.  Dkt. 101.  Plaintiffs also make claims against the City of Vancouver for violation

5  of their constitutional rights pursuant to *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978), and for

6  violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et. seq. Id.*

7       Trial is set to begin on October 19, 2015.  Dkt. 97.  The discovery deadline is June 22, 2015.

8  Dkt. 97.

9                    **II.      DISCUSSION**

10  **A. DEFENDANTS' MOTION TO STRIKE**

11       Defendants now move to strike Exhibits B (Dkt. 107-1, at 8-15), C (Dkt. 107-1, at 16-24), E

12  (Dkt. 107-2, at 3-7), J (Dkt. 107-7, at 2-3), N (Dkt. 107-9 at 2-6), O (Dkt. 107-9, at 8-9), R (Dkt.

13  107-10, at 19-32), S (Dkt. 107-11, at 2-3), and T (Dkt. 107-11, at 5-6) to the Parker Declaration

14  (Dkt. 107) and Exhibit U to the Wong Declaration (Dkt. 69-4).

15       For purposes of the present motion alone, the motion to strike should be granted, in part, and

16  denied, in part.  Exhibits B (Dkt. 107-1, at 8-15), C (Dkt. 107-1, at 16-24) purport to be autopsy

17  reports, and should be stricken because they are unsworn hearsay.  Exhibit E (Dkt. 107-2, at 3-7)

18  contains pictures, and though it should not be stricken, it is not relevant to the motion at hand.

19  Exhibit J (Dkt. 107-7, at 2-3) is a police interview with Devin Sailer and Exhibit O (Dkt. 107-9,

20  at 8-9) is a police interview with Mr. Tingley.  They should not be stricken, but were of limited

21  value.  Exhibit N (Dkt. 107-9, at 2-6) is an interview of Officer Gutierrez, and it should not be

22  stricken, but again is not of great value. Exhibit R (Dkt. 107-10, at 19-32), purporting to be a

23  transcript from a 9-1-1 call dated July 18, 2010 and Exhibits S (Dkt. 107-11, at 2-3), and T (Dkt.

24

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 11

107-11, at 5-6), (CAD logs from around that July 18, 2010 event) should also be stricken

because no foundation was laid for these exhibits.  Even if there were, they are of limited

relevance here.  Further, Exhibit U to the Wong Declaration (Dkt. 69-4) should also be stricken.

**B.  SUMMARY JUDGMENT – STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is

entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

showing on an essential element of a claim in the case on which the nonmoving party has the

burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)(nonmoving party must present specific, significant probative evidence, not simply "some

metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

material fact exists if there is sufficient evidence supporting the claimed factual dispute,

requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty

Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors

Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court

must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.

Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

of the nonmoving party only when the facts specifically attested by that party contradict facts

1  specifically attested by the moving party.  The nonmoving party may not merely state that it will

2  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

3  to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

4  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

5  be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

6  **C.  QUALIFIED IMMUNITY**

7      In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

8  conduct complained of was committed by a person acting under color of state law, and that (2)

9  the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

10  laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

11  *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).

12      Defendants in a Section 1983 action are entitled to qualified immunity from damages for

13  civil liability if their conduct does not violate clearly established statutory or constitutional rights

14  of which a reasonable person would have known.  *Pearson v. Callahan*, 129 S.Ct. 808, 815

15  (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances

16  two important interests: the need to hold public officials accountable when they exercise power

17  irresponsibly and the need to shield officials from harassment, distraction, and liability when

18  they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815.

19      In analyzing a qualified immunity defense, the Court determines: (1) whether a

20  constitutional right would have been violated on the facts alleged, taken in the light most

21  favorable to the party asserting the injury; and (2) whether the right was clearly established when

22  viewed in the specific context of the case.  *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "To be

23  clearly established, a right must be sufficiently clear that every reasonable official would have

24

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 13

understood that what he is doing violates that right." *Taylor v. Barkes*, No. 14-939, 2015 WL 2464055, at *2 (U.S. June 1, 2015).  While the sequence set forth in *Saucier* is often appropriate, it is longer mandatory.  *Pearson v. Callahan*, at 129 S.Ct at 811.

   *1.  Violation of Constitutional Right?*

Plaintiffs claim that Mr. Lookabill's Fourth and Fourteenth Amendment rights against being unreasonably seized were violated by the officers when they held him for 20-30 minutes and then shot him.  Dkt. 101.  Excessive force claims should be raised under the Fourth Amendment because it "provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct." *Graham v. Connor*, 490 U.S. 386, 395 (U.S. 1989).  The Fourth Amendment, "not the more generalized notion of 'substantive due process," must be the guide for analyzing these claims." *Id*.  To the extent that Plaintiffs assert a claim under the Fourteenth Amendment for excessive force, that claim should be dismissed.

Denise Wescom, Frank Wescom and Gage Wescom assert that their constitutional rights to family unity under the Fourteenth (Denise) and First Amendments (Frank and Gage) were violated when the officers shot Mr. Lookabill. Dkt. 101.

This opinion will first turn to the Fourth Amendment claims and then to the remaining constitutional claims.

   a.  Fourth Amendment – Unreasonable Seizure

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures."  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  In assessing whether a seizure is constitutionally reasonable courts balance "the nature

1    and quality of the intrusion on the individual's Fourth Amendment interests against the

2    countervailing governmental interests at stake." *Id.* The court must pay "careful attention to the

3    facts and circumstances of each particular case, including (1) the severity of the crime at issue,

4    (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3)

5    whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* In the Ninth

6    Circuit courts also consider, "under the totality of the circumstances, the quantum of force used,

7    the availability of less severe alternatives, and the suspect's mental and emotional state." *Hayes*

8    *v. Cnty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013)(*citing Davis v. City of Las Vegas,*

9    478 F.3d 1048, 1055 (9th Cir.2007) and *Deorle v. Rutherford,* 272 F.3d 1272, 1282 (9th

10   Cir.2001)). All determinations regarding the use of force, however, "must embody allowance for

11   the fact that police officers are often forced to make split-second judgments—in circumstances

12   that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

13   particular situation." *Hayes,* at 1232 *(citing Graham,* 490 U.S. at 396–97).

14       Plaintiffs Third Amended Complaint alleges that Mr. Lookabill's Fourth Amendment rights

15   were violated when he was seized for 20 to 30 minutes face down in the rain and when lethal

16   force was used against him. Dkt. 101.

17       *20 – 30 Minute Detention.* The nature and quality of the intrusion on Mr. Lookabill's Fourth

18   Amendment interests when the officers forced him to stay face down outside in the rain on an

19   early September morning for 20-30 minutes was minimal.

20       The countervailing government interests in keeping him there were significant.  Considering

21   the first *Graham* factor, the severity of the crime, it is undisputed that the officers were called to

22   the scene to deal with a man who was acting erratically, appeared to be intoxicated, and had

23   threatened people with a gun.  Mr. Presler called 9-1-1 and told dispatch that Mr. Lookabill was

24

1   yelling at them, drunk, "not really coherent," and "threatening with a gun."  Dkt. 39-1, at 7-8.

2   When dispatch sent the officers to respond to a "disturbance with a gun," they were told that the

3   suspect (Mr. Lookabill) was still standing across the street with a pistol in his hand.  Dkt. 39-1,

4   at 10-11.  Further, when Officer Gutierrez arrived, he could see that Mr. Lookabill was holding

5   an object in his right hand.  Dkt. 107-5, at 4.  Officer Gutierrez then realized that Mr. Lookabill

6   had a gun.  Dkt. 107-12, at 5, 10 and 14.  Even taking the facts in a light most favorable to

7   Plaintiffs, it was not unreasonable for Officer Gutierrez to order Mr. Lookabill to the ground and

8   hold his hands away from his waist considering that Mr. Lookabill was suspected of threatening

9   to commit an armed assault contrary to RCW 9A36.011 (assault in the first degree) and that the

10  gun was in his right front sweatshirt pocket.

11      The second *Graham* factor, whether the suspect poses an immediate threat to the safety of the

12  officers or others also weighs in favor of the officers.  This is the most important factor.  *Lal v.*

13  *California*, 746 F.3d 1112, 1117 (9th Cir.)(*cert. denied*, 135 S. Ct. 455 (2014)).  Mr. Lookabill

14  posed an immediate threat to the officers and others present.  He was suspected of threatening

15  people who were still on the scene watching.  Those individuals called the police regarding Mr.

16  Lookabill.  Mr. Lookabill repeatedly stated that he wanted to be a police officer and that he

17  should be on the police officers' side of this event.  It would not be unreasonable for the officers

18  to believe Mr. Lookabill posed a threat to the other people there.  Moreover, it is undisputed that

19  Mr. Lookabill was armed, intoxicated, and acting erratically.  He begged the police to come get

20  the gun from him and then would ask them to shoot him.  He threatened to shoot himself.  At

21  least one officer on the scene knew Mr. Lookabill had been suicidal a few months before. Mr.

22  Lookabill would say he wanted to be a policeman but then would scream obscenities at them.

23  Mr. Lookabill kept "target glancing" the officers.  All present were aware he had military

24  training and had served in Iraq.  He was repeatedly told not to reach for his waistband area.  On

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 16

at least one occasion prior to the shooting, he did so, saying "like this?" in what was described as a "taunting manner."  It was not unreasonable for the officers to detain him on the ground until he calmed down.

As to the third *Graham* factor, from the beginning, Mr. Lookabill was "actively resisting arrest or attempting to evade arrest" because he did not comply with the officers' commands. When he arrived, Officer Gutierrez told Mr. Lookabill to "stop" and "drop the gun," but Mr. Lookabill put the gun in his pocket. Dkt. 107-12, at 14.  Officer Gutierrez told Mr. Lookabill to get on the ground, which he did, and to face away from the officer, which he did not do.  Dkt. 107-5, at 5.  Mr. Lookabill was told to keep still, keep his arms extended out or up by his head. The civilian witnesses all testified that Mr. Lookabill was cooperative one moment but then would not follow the officers' commands.  Mr. Tingley stated Mr. Lookabill would "roll[] over on his back and then roll[] back over to his stomach" and would follow [commands] and then break 'em." Dkt. 45, at 13.  Mr. Presler said that Mr. Lookabill kept "lifting his head up, trying to get up, rolling over, putting his hands and feet in the air." Dkt. 45, at 58.  Although Mr. Tarbutton did not view Mr. Lookabill's movements as "threatening," he acknowledged that Mr. Lookabill kept moving.  All the police officers also state that Mr. Lookabill would sometimes comply with a directive, and then he would not.  It was not unreasonable for the officers to keep Mr. Lookabill on the ground until he fully complied with their directives.

Considering the minimal intrusion into Mr. Lookabill's rights and the significant government interests at stake, the officers acted in an objectively reasonable manner when they forced him to stay on the ground for 20-30 minutes in the rain on a late summer morning.  They did not violate his constitutional rights.

*Use of Deadly Force*.  Although the use of deadly force was the ultimate intrusion into Mr. Lookabill's rights, the government interests at stake outweighed the intrusion.  *Graham,* at 396.

1    The *Graham* factors support the officers' use of deadly force in this case.  The analyses for the

2    first and third *Graham* factors discussed above are the same for their decision to use deadly force

3    and are adopted here.

4         Considering the second *Graham* factor, the central issue in this case is whether it was

5    objectively reasonable under the circumstances for the officers to believe that Mr. Lookabill

6    posed an immediate threat to their safety, warranting the immediate use of deadly force, rather

7    than less severe alternatives, at the point they shot him.  *Hayes*, at 1233.

8         A police officer may not use deadly force unless "the officer has probable cause to believe

9    that the suspect poses a significant threat of death or serious physical injury to the officer or

10   others." *Tennessee v. Garner*, 471 U.S. 1, (1985) "Thus, where a suspect threatens an officer

11   with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v.*

12   *City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (*citing Billington v. Smith*, 292 F.3d 1177,

13   1185 (9th Cir.2002) (holding that deadly force was justified where a suspect violently resisted

14   arrest, physically attacked the officer, and grabbed the officer's gun); *Reynolds v. County of San*

15   *Diego*, 84 F.3d 1162, 1168 (9th Cir.1996) (holding that deadly force was reasonable where a

16   suspect, who had been behaving erratically, swung a knife at an officer); *Scott v. Henrich*, 39

17   F.3d 912, 914–15 (9th Cir.1994) (suggesting that the use of deadly force is objectively

18   reasonable where a suspect points a gun at officers); *Garcia v. United States*, 826 F.2d 806, 812

19   (9th Cir.1987) (holding that deadly force was reasonable where the plaintiff attacked a border

20   patrol agent with a rock and stick)).

21        At the time they opened fire, the officers had probable cause to believe that Mr. Lookabill

22   posed an immediate threat to the officers or others. Mr. Lookabill moved quickly and

23   deliberately for his gun without provocation.  He had been repeatedly warned not to do so by

24   several policemen with their guns drawn.  Moreover, they were justified in continuing to shoot

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 18

1    until it appeared Mr. Lookabill would stop.  "If police officers are justified in firing at a suspect

2    in order to end a severe threat to public safety, the officers need not stop shooting until the threat

3    has ended."  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014). Although Plaintiffs argue that

4    Mr. Lookabill did not pose an immediate threat to the officers after the first two shots were fired

5    (Dkt. 106, at 17), the record indicates that even after the first set of shots, Mr. Lookabill

6    continued to reach for his gun. Dkts. 105-1, at 16, 107-5, at 14-15 and 107-4, at 7.

7        Plaintiffs argue that there is no evidence that Mr. Lookabill drew his gun in the officers'

8    presence.  Dkt. 106, at 13.  Although "the mere fact that a suspect possesses a weapon does not

9    justify deadly force," threatening an officer with a weapon does justify the use of such force.

10   *Hayes*, at 1234.  Without citation to the record, Plaintiffs argue that there are issues of fact as to

11   whether Mr. Lookabill made a gesture that signaled he was reaching for his gun.  Dkt. 106, at 13.

12   Plaintiffs do state that "Mr. Lookabill did not reach for his gun at any point in time" in the

13   "Statement of the Facts" section of their Response. Dkt. 106, at 6 (*citing* Tarbutton Dec., ¶ 11 in

14   the record at Dkt. 59).  Although Mr. Tarbutton did say in his declaration that he did not see Mr.

15   Lookabill reach for his gun, Mr. Tarbutton explained further in his deposition that he was not

16   looking at Mr. Lookabill for the entire incident.  He turned and spoke with his roommate when

17   his roommate first came down the stairs.  His roommate walked away to use the bathroom and

18   Mr. Tarbutton resumed watching.  When Mr. Tarbutton's roommate returned after using the

19   bathroom, Mr. Tarbutton again turned away from Mr. Lookabill and talked to his roommate.  Mr.

20   Tarbutton stated that it was a few minutes later that he "heard" shots.  All the other witnesses

21   stated that Mr. Lookabill reached for his gun right before the officers fired.

22       Plaintiffs argue that the officers' fear of Mr. Lookabill was caused by their unreasonable

23   decision to take poor cover in the time preceding the shooting.  Dkt. 106, at 11.  They argue that

24

1   the officers were afraid of being shot because they used patrol cars as cover, and using a car for

2   cover is insufficient.  *Id.*  In essence, they argue that the officers negligently placed themselves in

3   harm's way.  This argument is unpersuasive for two reasons.

4      First, Plaintiffs' position on this issue conflicts with their other positions. Plaintiffs are

5   critical of the officers' failure to get close enough to Mr. Lookabill to retrieve the gun when he

6   asked them to do so, but now argue that the officers were afraid of Mr. Lookabill because they

7   were too close to him.

8      Second, and more importantly, in the Ninth Circuit, "the fact that an officer negligently gets

9   himself into a dangerous situation will not make it unreasonable for him to use force to defend

10  himself." *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002).  It is only where an "officer

11  intentionally or recklessly provokes a violent response, and the provocation is an independent

12  constitutional violation," that the officer's otherwise reasonable defensive use of force becomes

13  unreasonable as a matter of law. *Id.,* at 1190-1191.  "In such a case, the officer's initial

14  unconstitutional provocation, which arises from intentional or reckless conduct rather than mere

15  negligence, would proximately cause the subsequent application of deadly force." *Id.*

16     Plaintiffs make no showing that the officers here "intentionally or recklessly" provoked Mr.

17  Lookabill to try to draw his gun.  This case is similar to *Lal v. California*, 746 F.3d 1112 (9th

18  Cir.) (*cert. denied*, 135 S. Ct. 455, 190 L. Ed. 2d 331 (2014)).  In that case there was no evidence

19  that the officers intentionally provoked Lal. *Id.*  "They allowed Lal to lead them on a 45–minute

20  high-speed chase, during which they tried to talk him into surrendering, and when he got out of

21  the truck, they were willing to give him time to cool off." *Id.*  The officers shouted for Lal to put

22  his hands up and Lal briefly complied.  *Id.*  Then he said, "just shoot me," began to throw rocks

23  at the officers, and then picked up a football sized rock.  *Id.*  Lal advanced toward the officers

24

1    with it.  *Id.*  They told him to drop it, he did not.  *Id.*  They then shot him.  *Id.*  In affirming the

2    district court's dismissal of the Fourth Amendment claims, the Ninth Circuit found that it was

3    Lal who forced the confrontation.  *Id.*  The Court concluded that "even assuming that it might

4    have been possible for the officers to have given Lal a wider berth, under our opinion in

5    *Billington,* there is no requirement that such an alternative be explored."  *Id.*  As in *Lal,* the

6    totality of the circumstances here establish that the officers did not provoke Mr. Lookabill to try

7    to draw his gun.  They were waiting for Mr. Lookabill to calm down.  When Mr. Lookabill

8    forced the confrontation, the officers had to make a snap decision and whether to open fire.

9        Plaintiffs then argue that the officers should not have been afraid that Mr. Lookabill posed a

10   danger to anyone because the lights they had on Mr. Lookabill were "blinding" and he could not

11   see them if they stayed behind their lights.  Dkt. 106, at 12.  Plaintiffs argue that there are issues

12   of fact as to whether Mr. Lookabill was in a position to see the officers and shoot them.  *Id.*, at

13   13.  Although it is reasonable to assume that Mr. Lookabill may have had some difficulty seeing

14   some of the officers due to the spot lights, the record does not support Plaintiffs' argument that

15   he could not see any of the officers or the civilians outside watching.  *See e.g.* Dkts. 43, 50, 105-

16   2, at 13, and 107-15, at 24.  Further, Plaintiffs point to no authority that the officers must wait

17   until a suspect has a good shot before the use of lethal force is justified.  "The Fourth

18   Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay

19   'would gravely endanger their lives or the lives of others.'"  *City & Cnty. of San Francisco,*

20   *Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015).

21       Further, "the lack of availability of less severe alternatives" and the "suspect's mental and

22   emotional state" also support the finding that the officers acted objectively reasonably.  *Hayes at*

23   1223.  Plaintiffs argue that the officers failed to provide an adequate warning (that is telling him

24

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 21

1   they would shoot if he reached for his waistband) and that there was time to give one,

2   maintaining that this was a "less severe alternative" that was available. Dkt. 106, at 14.  This is

3   unpersuasive.  During the time he was on the ground, the officers continued talking to him to try

4   and calm him.  Mr. Lookabill was repeatedly warned not to reach for his waistband.  He was

5   aware of the possibility that he would be shot.  He was surrounded for at least 20 minutes by

6   officers with their weapons drawn.  He kept asking the officers to shoot him.  He asked if they

7   would shoot him if he threw the gun out into the road.  Mr. Lookabill forced the confrontation.

8   Once he began to move for his gun, the officers did not have any "less severe alternatives

9   available."  He had already ignored several of their directives not to reach for his waistband.

10  They had no reason to think he would comply if they added "or we will shoot."

11      Moreover, Mr. Lookabill's mental and emotional state created a situation where the officers

12  did not know what he would do next. Wild screaming and thrashing about one minute and then

13  being somewhat calm and compliant the next left all present unable to predict his actions.

14      A review of the facts and circumstances here shows that the government interests in the

15  safety of the officers and civilians present were exceeding high.  The officers acted in an

16  objectively reasonable manner.  The government interests at stake here outweighed the intrusion

17  into Mr. Lookabill's rights.  The officers are entitled to summary dismissal of this claim.

18                          b.  First and Fourteenth Amendment – Rights to Family Unity

19      Plaintiffs' claims for violation of their constitutional rights to family unity should be

20  dismissed.  The officers' use of force here was objectively reasonable.  Plaintiffs have certainly

21  failed to show that the officers' use of force was "deliberately indifferent" or that the officers had

22  a "purpose to harm" Mr. Lookabill which was "unrelated to legitimate law enforcement

23  objectives." *See Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (*quoting*

24

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 22

*Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir.2008)(claims for violation of the constitutional right to family unity based on the use of deadly force assessed under either the deliberate indifferent standard or purpose to harm standard).  Denise Wescom's, Frank Wescom's and Gage Wescom's claims for violations of their constitutional rights to family unity should be dismissed.

### 2.   *Clearly Established?*

Plaintiffs have failed to point to any evidence that their constitutional rights have been violated.  No further analysis is required.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060 (9th Cir. 2006).

Even if the officers had violated their constitutional rights, Defendants are entitled to qualified immunity.  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Taylor v. Barkes*, No. 14-939, 2015 WL 2464055, at *2 (U.S. June 1, 2015).  "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*, at 2 (*internal citation and quotation marks omitted*).  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," although a "case directly on point is not required."  *Id.*

Plaintiffs point to no case that shows that "every reasonable officer" would have understood that they were violating Mr. Lookabill's rights or the other Plaintiff's rights when the officers forced Mr. Lookabill to stay face down for 20-30 minutes or when they shot him after he attempted to retrieve his gun.  "A police officer's immunity does not become less if his assailant is motivated to commit 'suicide by cop.'"  *Lal v. California*, at 1118.  The claims against the individual officers should be dismissed.

**D.  CONCLUSION**

The claims against the individual officers should be dismissed.  The only remaining claims are against the City for violation of Plaintiffs' constitutional rights under § 1983 pursuant to *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978) and for violation of the ADA.

The case is heart breaking.  While the officers did not violate Plaintiffs' constitutional rights, the situation was tragic.

### III.   ORDER

It is **ORDERED** that:

- Defendants' Motion to Strike (Dkt. 109) **IS GRANTED, IN PART AND DENIED, IN PART,** as stated above;

- Defendants Franklin Gomez, John Schultz and Gerardo Gutierrez's Renewed Motion for Summary Judgment Re: Qualified Immunity (Dkt. 104) **IS GRANTED;**

  - The claims against Defendants Franklin Gomez, John Schultz and Gerardo Gutierrez **ARE DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 18th day of June, 2015.

ROBERT J. BRYAN
United States District Judge

ORDER ON DEFENDANTS' GOMEZ, SCHULTZ
AND GUTIERREZ'S RENEWED MOTION FOR
SUMMARY JUDGMENT- 24