UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| NIKKOLAS WREN KENNETH LOOKABILL, FRANK WESCOM, JR., parent and as personal representative of the Estate of NIKKOLAS LOOKABILL, deceased, DENISE WESCOM, and GAGE WESCOM,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF VANCOUVER, Vancouver Police Officers FRANKLIN N. GOMEZ, SERGEANT JOHN DARREN SCHULTZ, GERARDO GUTIERREZ; and DOES 1-5 inclusive,<br><br>Defendants. | CASE NO. 13-5461 RJB<br><br>ORDER ON CITY OF VANCOUVER'S MOTION FOR SUMMARY JUDGMENT |

1   This matter comes before the Court on Defendant City of Vancouver's Motion for
2   Summary Judgment. Dkt. 124.  The Court has reviewed the pleadings filed regarding the
3   motions and the remaining file.
4   This case arises from a tragic September 7, 2010 police officer involved shooting that
5   resulted in the death of military veteran Nikkolas Lookabill, who was alleged to suffer from post
6   traumatic stress disorder ("PTSD").  Dkt. 101.  Plaintiffs bring constitutional claims pursuant to
7   42 U.S.C. § 1983 and a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §
8   12132.  *Id.*
9   The individual officer defendants' motion to have the claims against them summarily
10  dismissed was granted on June 18, 2015.  Dkt. 121.  The remaining claims are against the City
11  for violation of Plaintiffs' constitutional rights under § 1983 pursuant to *Monell v. Department of*
12  *Social Servs.*, 436 U.S. 658, 690-91 (1978) and for violation of the ADA.  The City now moves
13  to have those claims dismissed.  Dkt. 124.  Even viewing the facts in a light most favorable to
14  Plaintiffs, the City's motion (Dkt. 124) should be granted and the remaining claims dismissed.

15                     **I.    FACTS AND PROCEDURAL HISTORY**

16  A.  **BACKGROUND FACTS**

17  The following background facts are taken from the June 18, 2015 Order on Defendants
18  Gomez, Schultz, and Gutierrez's Renewed Motion for Summary Judgment (Dkt. 121, at 1-9)
19  and are repeated here for ease of reference:
20  On September 7, 2010, Mitchell Tarbutton and Devin Sailer lived at 2901 Fruit Valley Road
21  in Vancouver, Washington. Dkt. 59, at 1.  Mr. Sailer, Mr. Tarbutton, and two other friends,
22  Kyle Tingley and Brandon Presler, were at Mr. Tarbutton's home after leaving a bar.  *Id.*, at 2.
23  Mr. Tingley, Mr. Presler, and Mr. Tarbutton were outside on the porch smoking.  Dkt. 45, at 7.
24

FOR SUMMARY JUDGMENT- 2

1  Around 3:30 a.m. they heard yelling and barking dogs across the street. *Id.* Nikkolas Lookabill,
2  who was walking south along Fruit Valley Road, stopped to yell, and even bark, at the dogs.
3  Dkt 59, at 1. According to Mr. Tarbutton, Mr. Lookabill was wearing gray sweat pants and a
4  sweatshirt. *Id.* Mr. Lookabill was talking on a cell phone. Dkt. 45, at 8. Mr. Tarbutton and the
5  others did not know Mr. Lookabill. Dkt. 59.

6      Mr. Tarbutton threw a beer bottle at Mr. Lookabill to scare him off. *Id.* Mr. Lookabill then
7  said, "Friend or foe?" *Id.* Mr. Tarbutton responded, "Friend, but leave. We're going to call the
8  cops if you don't go." *Id.* Mr. Lookabill remained. *Id.* Mr. Tingley approached Mr. Lookabill
9  and repeatedly asked him to leave. *Id.* Mr. Lookabill informed the group he had a gun and
10 again asked "Friend or foe?" *Id.* Mr. Tingley shook Mr. Lookabill's hand, and then Mr.
11 Lookabill pulled out his gun. *Id.* Mr. Presler called 9-1-1 and told dispatch that Mr. Lookabill
12 was yelling at them, drunk, "not really coherent," and "threatening with a gun." Dkt. 39-1, at 7-
13 8. In response to the question of why Mr. Lookabill was upset, Mr. Presler told dispatch that
14 Mr. Lookabill was "[j]ust walking down the road. And he's drunk. I don't know. He's just
15 randomly causing problems. He started yelling at the dogs and then started yelling at us. We
16 were standing across the street." Dkt. 39-1, at 7. Mr. Tingley stated that after Mr. Lookabill
17 pulled the gun, he put the gun back into his right sweatshirt pocket. Dkt. 107-9, at 9. Mr.
18 Tingley then turned and crossed the street. Dkt. 107-9, at 9.

19     City of Vancouver Police Officer Gerardo Gutierrez, a defendant here, arrived about that
20 time, around 3:39 a.m. Dkts. 107-5, at 3, 107-10, at 3, and 107-12. Officer Gutierrez had his
21 lights off at first, but then turned on his spotlight and pointed it at Mr. Lookabill. Dkt. 107-5, at
22 4. Officer Gutierrez stated that Mr. Lookabill pointed at him with his left hand and, although he
23 could not see Mr. Lookabill's right hand, Mr. Lookabill was holding an object "at a low ready."
24 Dkt. 107-5, at 4. Officer Gutierrez testified that Mr. Lookabill then began to back away from

him and had the gun out. Dkt. 107-12, at 10 and 14.  Officer Gutierrez testified that he told him to "stop" and "drop the gun."  Dkt. 107-12, at 14.  Mr. Lookabill did not drop the gun, but put it in his pocket.  Dkt. 107-12, at 14.  In a police interview, Mr. Presler stated that he did not see the gun out at that point, but stated that Mr. Lookabill was giving Officer Gutierrez "a little bit a problems [sic]."  Dkt. 107-6, at 3-4.  Officer Gutierrez told Mr. Lookabill to get on the ground, which he finally did, and to face away from the officer, which he did not do.  Dkt. 107-5, at 5.  As Mr. Lookabill got on the ground Officer Gutierrez heard a "metal clinking sound."  Dkt. 107-5, at 5.  Mr. Lookabill yelled erratically about being in the military and being in Iraq.  Dkt. 107-5, at 6.  Officer Gutierrez got out of his car, stood with the driver-side door open, and was using the police car and door as cover.  Dkt. 107-5, at 5.  His lower legs and upper body were exposed.  His weapon was drawn.  Dkt. 107-5, at 5.

Officer Gutierrez suspected that Mr. Lookabill was intoxicated.  Dkt. 107-5, at 8.  Mr. Lookabill acted extremely angry, then switched to being somber, then angry again.  Dkt. 107-5, at 8.  Officer Gutierrez felt that his manner and speech were aggressive.  Dkt. 107-5, at 8.  Officer Gutierrez stated that he ordered Mr. Lookabill to put his hands out to his side and then, when he stopped doing that, Officer Gutierrez tried ordering him to put his hands on his head.  Dkt. 107-5, at 9.

Sergeant John Schultz, a defendant here, arrived on the scene a few minutes later, and as a prior hostage negotiator, began to talk to Mr. Lookabill.  Dkt. 107-5, at 9.  Other officers also arrived (Dkt. 107-6, at 4) including Officer Frank Gomez (Dkt. 107-4, at 2-9), who is also a defendant here.  Officer Gomez, armed with a rifle, moved to the left of Officer Gutierrez, who was still using the police car and car door for cover.  Dkt. 107-4, at 4.  Officer Gomez could see the gun in Mr. Lookabill's right pocket.  Dkt. 107-15, at 14.  Mr. Lookabill was over 20 feet away from Officers Gomez and Gutierrez.  Dkt. 107-15, at 17.

1    Sergeant Schultz stated that when he arrived, Mr. Lookabill was yelling. Dkt. 105-2, at 8.

2    Sergeant Schultz testified they had the following exchange:

> During the time that he was yelling and I was trying to talk to him he would say things like you mother-fuckers are going to have to shoot me. He said things like you are going to send that dog in to bite my face. He repeatedly said fuck you.
> He said that he was in Iraq. He told me that he should be on the other side of this with us. He told me or I told him -- as I'm attempting to talk to him I told him things like you are not in trouble, nobody is here to hurt you. I repeated that.
> He told me he should have been on our side. He said that he had wanted to be a cop. When I told him that he was not in trouble, he told me not to use my cop shit -- he said don't use your cop shit on me, it is not going to work, I believe is what he said. He said he was in fucking Iraq. He said you mother-fuckers are going to have to shoot me.
> I repeatedly tried to talk to him. I repeatedly tried to get his attention. I told him my name was John. I told him I was with the police. He told me he had a gun. He told me it was in his front stomach pocket or front pocket.
> He told me he was going to reach for his gun. I told him not to reach for his gun. I told him do not reach for your gun. I believe what I said was, Nikkolas, do not reach for your gun.

Dkt. 105-2, at 8-9.

Around this time, Officer Gutierrez realized that he knew Mr. Lookabill from a prior incident a few months before. Dkts. 107-5, at 6 and 107-12, at 18. Officer Gutierrez recalled Mr. Lookabill's girlfriend had reported Mr. Lookabill was suffering from post traumatic stress disorder and was talking about suicide. Dkt. 107-5, at 6-7 and 107-12, at 17-18. Officer Gutierrez remembered that in that incident, Mr. Lookabill was taken to the Veteran's Hospital. Dkt. 107-5, at 7. He recalled that Mr. Lookabill expressed an interest in becoming a police officer at that time as well. Dkt. 107-5, at 7. Officer Gutierrez did not have a chance to tell Sergeant Schultz that he had had prior contact with Mr. Lookabill. Dkt. 107-12, at 18.

At the officers' request, Mr. Tarbutton, Mr. Tingley and Mr. Presler moved toward Mr. Tarbutton's home. Dkt. 59, at 3. Mr. Tarbutton went in the home, looked out his open front

door, and could see Mr. Lookabill lying down on his stomach. Dkts. 59, at 3 and 105-4, at 23. Mr. Tingley and Presler went to the side of the house and watched. Dkt. 107-6, at 5.

Mr. Tarbutton stated that Mr. Lookabill appeared to "be angry and agitated," was "yelling to the officers about his girlfriend or something," and slurring his words. Dkt. 59, at 3-4. In his declaration, Mr. Tarbutton stated that Mr. Lookabill was "flat on his stomach and his arms, legs and hands were spread out" the entire time. Dkt. 59, at 40. Mr. Tarbutton later testified that Mr. Lookabill flipped the officers off four or five times, was moving his arms "out and around" and was kicking his legs. Dkt. 107-16, at 15 and 13. Mr. Tarbutton also stated that his roommate, Devin Sailor, came downstairs and asked what all the shouting was about. Dkt. 59, at 4. Mr. Tarbutton turned and spoke with Mr. Sailer for a moment. Dkts. 59, at 4 and 105-4, at 11 and 22. Mr. Sailer then walked off and used the restroom. Dkt. 105-4, at 20. Mr. Tarbutton stated that he never felt like Mr. Lookabill's motions were threatening. Dkt. 107-16, at 14. He described Mr. Lookabill's movement more like a "tantrum . . . like just upset, waving his arms around because he's upset, not because he's trying to reach for his gun or anything." Dkt. 107-16, at 14. Mr. Tingley remembered Mr. Lookabill rolling around and flipping over onto his back and flipping the officers off. Dkt. 107-8, at 11. Mr. Presler stated that Mr. Lookabill stayed on the ground "but other than that he was just kinda flailing." Dkt. 107-6, at 6.

Officer Gomez stated that Mr. Lookabill kept lifting his upper body off the ground, turning his head, and looking around. Dkt. 107-4, at 5. Officer Gomez stated that Mr. Lookabill was screaming obscenities, was very agitated, and not compliant. Dkt. 107-4, at 5. Officer Gomez asserted that Mr. Lookabill kept raising his body off the ground looking around "as if he was looking to find where [the police officers] were" in order to target them. Dkt. 107-15, at 24. Sergeant Schultz described Mr. Lookabill as agitated and aggressive. Dkt. 107-7, at 8.

Sergeant Schultz was concerned about Mr. Lookabill's continued mention of his military service in Iraq. Dkt. 107-7, at 8. He was worried about Mr. Lookabill's combat experience and what that would mean tactically for the officers present. Dkt. 107-7, at 8. Sergeant Schultz kept trying to talk with Mr. Lookabill to calm him down. Dkt. 105-2, at 9. He stated that Mr. Lookabill kept saying that the police officers were "going to have to shoot [him]." Dkt. 105-2, at 9.

Mr. Tarbutton stated that Mr. Lookabill said, "come take the gun from me" multiple times. Dkt. 107-16, at 12. Mr. Tarbutton stated that Mr. Lookabill told the officers that the gun was in the center pocket of his sweatshirt. Dkt. 59, at 3. According to Mr. Tarbutton, the officers responded with "you need to calm down more." Dkt. 107-16, at 12. Mr. Tarbutton felt that the officers were just "waiting for something." Dkt. 107-16, at 13. Mr. Tarbutton heard the officers repeatedly tell Mr. Lookabill not to reach for his pocket. Dkt. 107-16, at 13-14.

Mr. Tarbutton stated that Mr. Lookabill started talking about wanting to throw the gun into the road and asked the officers if they were going to shoot him if he did. Dkt. 59, at 3. Mr. Tarbutton stated that eventually, Mr. Lookabill wasn't "barking orders," but was kind of "begging" the police to come take the gun from him. Dkt. 107-16, at 16. According to Mr. Tarbutton, Mr. Lookabill was "literally begging like, 'Come take the gun from me.' Like, 'Please come take the gun from me.'" Dkt. 107-16, at 16.

According to Mr. Tarbutton, Mr. Lookabill said, "I'm going to countdown from thirty and then if you don't come take the gun from me, I'm going to start smashing my head into the sidewalk." Dkt. 59, at 3-4. Officer Gutierrez stated that he was under the impression that Mr. Lookabill was going to do a countdown and then stand up. Dkt. 107-5, at 11. Mr. Presler stated that he thought that Mr. Lookabill said that after he did the countdown "I'm gonna shoot myself in the head if I get to zero if you guys don't take my gun." Dkt.107-6, at 5.

1    Mr. Lookabill counted down.  Dkt. 59, at 4.  Mr. Tingley stated that after the countdown,
2  Mr. Lookabill flipped over onto his back and flipped the officers off again while screaming
3  obscenities.  Dkt. 107-8, at 12.  Mr. Tarbutton stated that after Mr. Lookabill "moved his arms
4  up to flip the officers off" he then moved them over his head again.  Dkt. 59, at 4.  Officer
5  Gutierrez stated that Mr. Lookabill kept saying "Just kill me," and "I'm not going to shoot you"
6  and that he wanted to be a cop.  Dkt. 107-5, at 13.  Mr. Presler stated that after the countdown,
7  Mr. Lookabill said "What, you guys don't F'n care about me, you don't care if I do it or not?"
8  Dkt. 107-6, at 5.

9    About this point, Mr. Lookabill took off his wedding ring and threw it.  Dkt. 107-5, at 11.
10  Officer Gutierrez thought, "Oh, that's not good."  Dkt. 107-5, at 11.

11    Sergeant Schultz kept talking with Mr. Lookabill, but could not seem to calm him down, so
12  he contacted dispatch on his radio and requested that the leader from the hostage negotiator team
13  be sent to the scene.  Dkt. 105-2, at 19-23.  The other negotiator did not arrive until after shots
14  were fired.  *Id.*

15    Officer Gutierrez stated that Sergeant Schultz kept telling Mr. Lookabill, "'Do not bring
16  your hands down by your waistband,' because he was starting to do [that]."  Dkt. 107-5, at 11.
17  Officer Gutierrez stated that, at one point, Mr. Lookabill (who was on his stomach) said "Like
18  this?" and quickly raised up and moved his right hand up and down toward his waistband.  Dkt.
19  107-5, at 11.  Mr. Presler also saw Mr. Lookabill reach for his waistband at that point.  107-6, at
20  6.  The officers screamed "don't do that."  Dkt. 39-1, at 14.  Officer Gutierrez was shocked that
21  Mr. Lookabill moved so quickly and in a "taunting" manner.  Dkt. 107-5, at 12.  Officer
22  Gutierrez  turned to Officer Gomez and said that if Mr. Lookabill did something like that again,
23  he was going to shoot him.  Dkt. 107-5, at 12.

24

After that, Officer Gutierrez stated that Mr. Lookabill was face down with his hands approximately at shoulder level. Dkts. 107-5, at 14 and 107-13, at 3. According to Mr. Presler, the officers kept telling Mr. Lookabill to stay still, stay on the ground, and keep his hands flat on the ground. Dkt. 107-6, at 6. Mr. Lookabill made a motion with his left hand, and then suddenly brought his right hand down toward his waistband. Dkt. 107-5, at 14. According to Officer Donald Margarian, as he reached down, Mr. Lookabill's hand made a gripping type motion toward the gun that Officer Margarian could see sticking out of his sweatshirt pocket. Dkt. 49, at 27-28. Officer Gutierrez and Officer Gomez fired one round at Mr. Lookabill's upper torso. Dkts. 107-5, at 14 and 107-4, at 7. Mr. Lookabill continued to move his right hand down and he brought his right knee up. Dkts. 107-5, at 14 and 107-4, at 7. As Mr. Lookabill rose up, Officer Gutierrez fired at him again, and Mr. Lookabill began to roll toward Officer Gutierrez. Dkt. 107-5, at 15. Officer Gutierrez stated that Mr. Lookabill had the gun in his hand and was drawing it out of his sweatshirt at that point. Dkt. 105-1, at 16. Officer Gutierrez then fired a third, fourth, and fifth time. Dkt. 107-5, at 15. Officer Gomez also fired two additional shots, aiming for Mr. Lookabill's head. Dkt. 107-4, at 7. Sergeant Schultz fired his weapon twice as well. Dkts. 107-7, at 9 and 107-14, at 18. The shots were fired around 4:02 a.m. Dkt. 107-10, at 3.

Mr. Presler, who was still watching from the side of the house, saw Mr. Lookabill move his right arm down "like he was gonna reach for a gun." Dkt. 107-6, at 5. Mr. Tingley saw Mr. Lookabill roll around and then reached with his right hand down toward his waist. Dkt. 107-8, at 7. Although in his declaration, Mr. Tarbutton stated that he did not see Mr. Lookabill reach for his gun, in his deposition, Mr. Tarbutton acknowledged that his roommate, Mr. Sailer, returned from the restroom and Mr. Tarbutton turned and spoke with Mr. Sailer. Dkts. 59, at 4 and 105-4, at 11 and 22. Mr. Tarbutton stated that "[a] minute or two later, I then heard

gunshots and looked out and saw Mr. Lookabill roll over to his back and his hands kind of came up." Dkt. 59, at 4.

Mr. Lookabill died at the scene from multiple gunshot wounds. At the time of death, his blood reflected an alcohol content of .23 g/100 ml and a .12 mg/liter of the antidepressant citolopram. Dkt. 107-11, at 8.

**B. PROCEDURAL HISTORY**

The procedural history is in the June 18, 2015 Order on Defendants Gomez, Schultz, and Gutierrez's Renewed Motion for Summary Judgment (Dkt. 121, at 9-11) and is adopted.

## II. DISCUSSION

**A. SUMMARY JUDGMENT – STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

*Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. CONSTITUTIONAL CLAIMS AGAINST THE CITY UNDER *MONELL*

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). A municipality or other local government may be liable under § 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)(*internal quotations and citations omitted*). A municipality is not vicariously liable under § 1983 for their employees' actions, but "only for their own illegal acts." *Id.* "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant

1   to official municipal policy caused their injury." *Id*.  Official municipal policy includes the

2   decisions of the municipality's lawmakers, "the acts of its policymaking officials, and practices

3   so persistent and widespread as to practically have the force of law." *Id.*

4         In order to assert a § 1983 *Monell* claim based on "customs and policies," a Plaintiff must

5   show: "(1) that he was deprived of his constitutional rights by defendants and their employees

6   acting under color of state law; (2) that the defendants have customs or policies which amount to

7   deliberate indifference to ... constitutional rights; and (3) that these policies were the moving

8   force behind the constitutional violations." *Gant v. Cnty. of Los Angeles*, 772 F.3d 608, 617 (9th

9   Cir. 2014)(*internal quotations and citations omitted*).

10         On June 18, 2015, this Court found that the individual officers had not violated Mr.

11   Lookabill's or Plaintiffs' constitutional rights.  Dkt. 121.  Accordingly, Plaintiffs' § 1983 claims

12   under *Monell* should be dismissed.  *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1231 (9th Cir.

13   2013)(dismissing *Monell* claim where there was no violation of constitutional rights)(*citing Van*

14   *Ort v. Estate of Stanewich*, 92 F.3d 831, 835–36 (9th Cir.1996) (noting that a constitutional

15   violation is required to support *Monell* liability)).  In the June 18, 2015 Order, the undersigned

16   also held that even if the individual officers had violated Mr. Lookabill's and Plaintiffs'

17   constitutional rights, they were entitled to qualified immunity.  Dkt. 121.  (Plaintiffs argue it was

18   "not entirely clear" whether the Court found that their constitutional rights were violated because

19   of the determination that the officers were also entitled to qualified immunity.  Dkt. 127, at 3.

20   Although the June 18, 2015 order explicitly holds that their constitutional rights were not

21   violated, by way of further clarification, the Court repeats that the individual officers did not

22   violate Mr. Lookabill's or the Plaintiffs' constitutional rights.)  The Plaintiffs' constitutional

23   claims asserted against the City should be dismissed.

24

## C. ADA CLAIM

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Plaintiffs argue that the City violated the ADA by committing "'wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity." Dkt. 127, at 7 (*quoting Sheehan v. San Francisco*, 743 F.3d 1211 (2014)(*reversed on other grounds, City and Cnty. Of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015)). Plaintiffs also maintain that the City violated the ADA for failing to reasonably accommodate Mr. Lookabill's disability. *Id.* They explain that this ADA violation occurs "where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.*

The principle case that Plaintiffs rely upon, *Sheehan v. City and Cnty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), was before the U.S. Supreme Court in 2015. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1772, 191 L. Ed. 2d 856 (2015). (In *Sheehan*, the Ninth Circuit held that the ADA applies to arrests.) The *Sheehan* defendants initially requested certiorari on the question of whether the ADA "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody," arguing that there was a split in the circuits as to whether the ADA applies to arrests. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1772, 191 L. Ed. 2d

1  856 (2015). The U.S. Supreme Court "dismissed" [sic] the question, holding that certiorari was
2  improvidently granted because the defendants failed to brief the question to the Court (arguing
3  instead that under 28 C.F.R. §§ 35.139(a) and 35.104, "a person who poses a direct threat or
4  significant risk to the safety of others is not qualified for accommodations under the ADA") and
5  failed to adequately raise that new issue in the Ninth Circuit. *Id*. The ADA claim was remanded
6  to the Ninth Circuit and the Ninth Circuit remanded the ADA claim to the district court.

7  Accordingly, the Ninth Circuit's holding in *Sheehan*, that the ADA applies to arrests, is still
8  binding on this Court. To make a claim under Title II of the ADA then, Plaintiffs must show that
9  (1) Mr. Lookabill was a qualified individual with a disability; (2) he was excluded from
10 participation in or otherwise discriminated against with regard to a public entity's services,
11 programs or activities, and (3) such exclusion or discrimination was by reason of Mr. Lookabill's
12 disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

13 Plaintiffs claim under the ADA should be dismissed because they failed to make a showing
14 on either the first or third factor: that Mr. Lookabill was a "qualified individual with a disability"
15 or that such exclusion or discrimination was by reason of his disability. Under *Sheehan*, Mr.
16 Lookabill's arrest is included in a "public entity's services, programs or activities" clause so the
17 second factor is met. Analysis of the first and third factors follows.

18       1.   <u>Qualified Individual with a Disability?</u>

19 The Plaintiffs failed to show that Mr. Lookabill was a qualified individual with a disability.
20 Although the Plaintiffs alleged in their Complaint the Mr. Lookabill had PTSD, and for purposes
21 of introducing the case, the undersigned repeated Plaintiffs' allegation, Plaintiffs failed to
22 provide any evidence that Mr. Lookabill actually had PTSD or that the officers perceived him as
23 having a disability. The only evidence in the record regarding a disability was Officer
24

1   Gutierrez's recollection that Mr. Lookabill's girlfriend reported Mr. Lookabill was suffering

2   from PTSD and was talking about suicide months prior to this episode.  Dkt. 107-5, at 6-7 and

3   107-12, at 17-18.  Officer Gutierrez remembered that in that incident, Mr. Lookabill was taken to

4   the Veteran's Hospital.  Dkt. 107-5, at 7.  Officer Gutierrez did not have a chance to tell any of

5   the other officers that he had had prior contact with Mr. Lookabill.  Dkt. 107-12, at 18.  The City

6   properly points out that this hearsay evidence is insufficient to establish that Mr. Lookabill did,

7   in fact, have a disability or that he was perceived as having one.

8       The City also advances the same argument here that the *Sheehan* defendants raised with the

9   Supreme Court, but the Supreme Court did not reach.  It argues that Mr. Lookabill was not a

10  "qualified individual with a disability" requiring accommodation.  Dkt. 124.  It points out that

11  the ADA charges the Attorney General with issuing regulations and technical guidance on the

12  ADA.  *Id.* (*citing* 42 U.S.C. §§ 12134(a), 12206(c)(1), and 28 C.F.R. part 35.)  One such

13  regulation promulgated by the Attorney General provides that Title II "does not require a public

14  entity to permit an individual to participate in or benefit from the services, programs, or activities

15  of that public entity when that individual poses a direct threat to the health or safety of others."

16  28 C.F.R. § 35.139(a).  Under 28 C.F.R. § 35.104, a "direct threat" is "a significant risk to the

17  health or safety of others that cannot be eliminated by a modification of policies, practices or

18  procedures, or by the provision of auxiliary aids or services as provided in § 35.139."  In

19  deciding whether a significant risk exists, a public entity must make an "individualized

20  assessment, based on reasonable judgment" relying on "current medical knowledge or on the

21  best available objective evidence, to ascertain:  the nature, duration, and severity of the risk; the

22  probability that the potential injury will actually occur, and whether reasonable modifications of

23

24

1  policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the
2  risk." 28 C.F.R. § 35.139(b).
3      In the circumstances presented here, Mr. Lookabill was not a "qualified individual with a
4  disability" because he posed a "direct threat" to the "health or safety of others." The officers
5  were called to the scene to deal with Mr. Lookabill, who appeared to be intoxicated and had
6  threatened people with a gun. He was armed, non-compliant, and acting erratically. He begged
7  the police to come get the gun from him and then would ask them to shoot him. He threatened to
8  shoot himself. Mr. Lookabill would say he wanted to be a policeman but then would scream
9  obscenities at them. Mr. Lookabill kept "target glancing" the officers. All present were aware
10 he had military training and had served in Iraq. Further, the undersigned has already held that
11 "[a]t the time they opened fire, the officers had probable cause to believe that Mr. Lookabill
12 posed an immediate threat to the officers or others. Mr. Lookabill moved quickly and
13 deliberately for his gun without provocation. He had been repeatedly warned not to do so by
14 several policemen with their guns drawn." Dkt. 121. Mr. Lookabill posed a significant threat to
15 the officers, other civilians, and to himself. He was not a qualified individual with a disability
16 under the ADA.
17     Plaintiffs argue that certain accommodations should have been implemented, for example
18 that the officers should not have ordered Mr. Lookabill to the ground, but should have him "put
19 his hands above his head and turn around" and that the officers should not have been positioned
20 so closely to Mr. Lookabill, and that way would not have felt threatened. Plaintiff does so
21 without any evidence to support these suppositions. Aside from bare assertions, Plaintiffs fail to
22 show that these actions would have mitigated the risk posed by Mr. Lookabill when the officers
23 encountered him or afterward. There is no showing that any modification of policy, practice, or
24

1  procedure or the provision of auxiliary aids or services would have mitigated the risk.  28 C.F.R.
2  § 35.139(b).  In addition to failing to show that Mr. Lookabill was a "qualified individual with a
3  disability," Plaintiffs failed to show that the officers' alleged discrimination or failure to
4  accommodate was "by reason of" his disability.

5        2.   <u>Exclusion or Discrimination by Reason of Disability</u>

6      The alleged discrimination or failure to accommodate must be "*solely by reason of*
7  *disability.*"  *Weinreich v. Los Angeles Cnty. Metro. Transp. Authority*, 114 F. 3d 976, 978-79
8  (9th Cir. 1997)(*emphasis in original*)

9      Even assuming that Mr. Lookabill was a "qualified individual with a disability," Plaintiffs
10  failed to show that the officers here discriminated against him or failed to accommodate him
11  solely due to his PTSD.  The toxicology report indicates that Mr. Lookabill was extremely
12  intoxicated, his blood reflected an alcohol content of .23 g/100 ml and a .12 mg/liter of the
13  antidepressant citolopram. Dkt. 107-11, at 8.  Plaintiffs have failed to show that Mr. Lookabill's
14  behavior (that caused the officers' actions) were the effects of his disability rather than the result
15  of his intoxication.  Plaintiffs ADA claim should be dismissed.

16                 **III.**    <u>**ORDER**</u>

17      It is **ORDERED** that:

18        •  Defendant City of Vancouver's Motion for Summary Judgment (Dkt. 124) **IS**
19          **GRANTED;**
20            o  The claims against the City of Vancouver **ARE DISMISSED;**
21            o  This case is **CLOSED**.

22      The Clerk is directed to send uncertified copies of this Order to all counsel of record and
23  to any party appearing *pro se* at said party's last known address.

24

Dated this 3rd day of August, 2015.

*/s/ Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge